REC'D OCT 09 2020
REC'D OCT 23 2020

Ryon Rodgers and Katherine James
5745 Picker St. Apt. 204
Riverside, CA 92503
Tel: (951) 756-8600

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE
OCT 23 2020
L. VILLANUEVA

LW1 OCT 27 2020 R

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF RIVERSIDE**

| | |
|---|---|
| | RIC 2004236 |
| RYON RODGERS, an individual; KATHERINE JAMES, an individual; Plaintiffs, vs. ROBERT SNYDER, an individual; JOHN ALLEN, an individual; Defendants. | **COMPLAINT FOR DAMAGES**<br><br>1. CIVIL RIGHTS VIOLATION — INFRINGEMENT UPON FREEDOM OF SPEECH, Bivens Action<br><br>2. CIVIL RIGHTS VIOLATION — VIOLATION OF DUE PROCESS, Bivens Action<br><br>3. UNLAWFUL TERMINATION (Rodgers);<br><br>4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Rodgers);<br><br>5. UNLAWFUL TERMINATION (James);<br><br>6. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (James).<br><br>Case No.: |

REC'D OCT 09 2020
REC'D OCT 23 2020

Ryon Rodgers and Katherine James
5745 Picker St. Apt. 204
Riverside, CA 92503
Tel: (951) 756-8600

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE
OCT 23 2020
L. VILLANUEVA

LW1 OCT 27 2020 R

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF RIVERSIDE**

RIC 2004236

| | |
|---|---|
| RYON RODGERS,<br>an individual;<br>KATHERINE JAMES,<br>an individual;<br>Plaintiffs,<br>vs.<br>ROBERT SNYDER,<br>an individual;<br>JOHN ALLEN,<br>an individual;<br>Defendants. | **COMPLAINT FOR DAMAGES**<br><br>1. CIVIL RIGHTS VIOLATION — INFRINGEMENT UPON FREEDOM OF SPEECH, Bivens Action<br><br>2. CIVIL RIGHTS VIOLATION — VIOLATION OF DUE PROCESS, Bivens Action<br><br>3. UNLAWFUL TERMINATION (Rodgers);<br><br>4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Rodgers);<br><br>5. UNLAWFUL TERMINATION (James);<br><br>6. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (James).<br><br>Case No.: |

## INTRODUCTION

Plaintiff, RYON RODGERS, hereby referred to in the first person, alleges that defendants, ROBERT SNYDER and JOHN ALLEN, acting as officers of the Census Bureau of the United States Chamber of Commerce, violated my civil rights, unlawfully terminated me from my job as an enumerator, and constructively discharged my wife and co-plaintiff, KATHERINE JAMES.

The incident leading to the termination occurred on August 31st, 2020 while I was on assignment to collect census data at the Renew Complex in Riverside, California. One of the respondents was particularly uncooperative and did not want to answer any of my questions. She started harassing me as I made my way to other apartments, accused me of being a criminal casing her neighborhood, and proceeded to call the police on me. Afraid of her making any further insipid allegations to the authorities and not wanting it to just be her word against mine, I decided to livestream the rest of our interaction from my personal cell phone until I was able to make it safely away from the area.

Two days later, I was called into the office by my immediate supervisor to speak with management. I met with Census Field Manager, Defendant John Allen, who promptly advised me that I was being terminated. He did not read my report, he cared nothing about hearing my side of the story. I was simply told to turn in my badge and the rest of my equipment as soon as possible. Upon returning home, I was able to reach the head of the office, Defendant Robert Snyder. Showing little empathy for my situation, he elaborated that I was being terminated for violating § 9 of Title 13 of the U.S. Code by having published the video of the harassment I endured at the apartment complex. He further threatened severe legal ramifications if I didn't immediately delete the video.

As government employers, Defendants violated employment law and my civil rights by terminating me without due process and completely disregarded their fundamental responsibility to

## INTRODUCTION

Plaintiff, RYON RODGERS, hereby referred to in the first person, alleges that defendants, ROBERT SNYDER and JOHN ALLEN, acting as officers of the Census Bureau of the United States Chamber of Commerce, violated my civil rights, unlawfully terminated me from my job as an enumerator, and constructively discharged my wife and co-plaintiff, KATHERINE JAMES.

The incident leading to the termination occurred on August 31st, 2020 while I was on assignment to collect census data at the Renew Complex in Riverside, California. One of the respondents was particularly uncooperative and did not want to answer any of my questions. She started harassing me as I made my way to other apartments, accused me of being a criminal casing her neighborhood, and proceeded to call the police on me. Afraid of her making any further insipid allegations to the authorities and not wanting it to just be her word against mine, I decided to livestream the rest of our interaction from my personal cell phone until I was able to make it safely away from the area.

Two days later, I was called into the office by my immediate supervisor to speak with management. I met with Census Field Manager, Defendant John Allen, who promptly advised me that I was being terminated. He did not read my report, he cared nothing about hearing my side of the story. I was simply told to turn in my badge and the rest of my equipment as soon as possible. Upon returning home, I was able to reach the head of the office, Defendant Robert Snyder. Showing little empathy for my situation, he elaborated that I was being terminated for violating § 9 of Title 13 of the U.S. Code by having published the video of the harassment I endured at the apartment complex. He further threatened severe legal ramifications if I didn't immediately delete the video.

As government employers, Defendants violated employment law and my civil rights by terminating me without due process and completely disregarded their fundamental responsibility to

protect my freedom of speech. They terminated me and constructively discharged my wife in retaliation towards my publishing of a video which:

1) was aimed to protect me against malicious persecution while enduring racism and harassment,
2) having accomplished that, the videos had an ancillary benefit of bringing attention the increasing regularity of racial discrimination suffered by black Americans on the job,
3) accurately reported on the risks of the Census Bureau workplace, as allowable by California statute,
4) broke no law, employment guideline, or public policy.

Several days later, my wife, Katherine James, resigned from her job at the Census Bureau. The callous and racially insensitive conduct of John Allen and Robert Snyder towards my unlawful termination, was such that no reasonable person in a similar situation could have stayed around and continued working.

The defendants not only callously disregarded the bigotry that can occur to their workers in the field but acted to deprive and furthermore penalize our fundamental freedom to speak out against it. In doing so, they subjected my wife and I to financial harm and severe emotional distress. This action is brought for the purpose of vindicating our employment and civil rights and be made whole for the humiliation and stress we continue to endure.

**PARTIES**

1. Plaintiff RYON RODGERS is an individual who resides in Riverside County, California. He is married to co-plaintiff, Katherine James.
2. Plaintiff KATHERINE JAMES is an individual who resides in Riverside County, California. She is married to co-plaintiff, Ryon Rodgers.

3. Defendant ROBERT SNYDER is the Riverside Area Census Office (ACO) manager of the Census Bureau of the United States Department of Commerce and resides in Riverside County, California.

4. Defendant JOHN ALLEN is a Census Field Manager at the Riverside office of the Census Bureau of the United States Department of Commerce. He likewise resides in Riverside County, California.

## JURISDICTION AND VENUE

5. A Bivens action is eligible to be commenced in State Court under 28 U.S. Code § 1442.

6. This Court has jurisdiction because the incident arose in Riverside and both Defendants reside in the county.

7. Venue is proper in this county in accordance with California Code of Civil Procedure § 395.5 because Defendants' liability for the alleged actions arose in this county.

## GENERAL ALLEGATIONS

8. I was classified as an employee for the Census Bureau office located at: 1605 Spruce St. Suite 104, Riverside, CA 92507.

9. My employment as an enumerator began on June 13th, 2020 and was set to end by the last week of September barring any delays to our collection of data.

10. Upon completion of my tenure at the Riverside office, I was promised to be transferred to San Bernardino to help their office finish their census data collection. Such an extension was seen as a reward for my stellar reviews and achievement of all possible performance bonuses.

11. My wife and co-plaintiff, Katherine James, began her employment for the Riverside office as an enumerator in 2019 before starting work as an office clerk this year. She was promoted to office operations supervisor on August 25th, 2020.

12. On Monday, August 31st, 2020, I was assigned to collect census data at the Renew Apartment Complex in Riverside, California.

13. The people we are supposed to survey for the Census are known as "respondents."

14. The principal incident arose after one of my respondents proved uncooperative and from the outset, refused to answer my questions. Furthermore she berated me, accused me of lying about being a census taker, accused me of being a criminal, and said that she'd been watching me for the better part of the hour from her apartment window. Eventually her yelling caused her husband to come to the door to investigate the commotion.

15. After reiterating his wife's sentiments that they would not be answering any questions, the husband went back inside their apartment while the wife yelled at me to "get off [their] property."

16. I tried to move to the next address on my route, an apartment which was across the stairway but still within sight and earshot of the respondent's residence.

17. When she realized that I was not completely leaving — as in, I was continuing on my route door-to-door — the respondent adhered to her threat and began calling the police. At this point, with no other witnesses to this harassment and fearing potential complication should the respondent extend her lies about me to the police, I took out my personal cell phone and began recording the remainder of our interaction.

18. The video streamed to Facebook Live while I calmly narrated what was happening to me. At no point did I ever mention any data or identifying information about the respondent. My only remarks were about the racism and discrimination I was experiencing.

19. The respondent was fully aware that I was recording our interaction because I had told her that it was what I was doing.

20. The recording incidentally picked up the respondent's name, address, and phone number as she was reporting it loudly to the police during her call.

21. When I made my way to a safe distance in the parking lot, I called my supervisor, Claret Garcia, and told her that I had to abandon my shift because of the racist episode as described above, told her that "I am done" and that I am leaving the complex. My supervisor, however, requested that I stay until she could arrive to straighten things out.

22. Ten minutes later, my supervisor and my wife showed up, the latter of whom had seen the video through my Facebook feed and immediately called to check up on me. Police arrived approximately 90 minutes later.

23. I had intended to take the next couple of days off to mentally recover from the incident, which has weighed heavy on me up through this day. That Wednesday, September 2nd, however, the supervisor called me, audibly distraught, telling me to report to the office and meet with the Census Field Manager, John Allen.

24. When I arrived, there was a palpable tension throughout the office with some of my colleagues having already heard about the incident. Rumors were already circulating about my imminent termination. I sat in the lobby waiting for a chance to speak with John Allen, while filling out an incident report and finishing the case notes describing what had happened.

25. After waiting for approximately 15 minutes, John Allen came out of his office, took the report I had written, and without even glancing at it, informed me of my immediate termination. He demanded that I turn in my badge and other agency materials as soon as possible.

26. When I got home, I called the office again, this time seeking at least an explanation for why I just got fired so abruptly. I was connected with the defendant, Robert Snyder, who said I was getting fired for violating § 9 of Title 13 of the U.S. Code, governing the administration of the Census.

27. § 9 of Title 13 of the U.S. Code states:

> *Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, or local government census liaison, may, except as provided in section 8 or 16 or chapter 10 of this title or section 210 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998 or section 2(f) of the Census of Agriculture Act of 1997—*
>
> *(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or*
>
> *(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or*
>
> *(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.*

28. Paraphrased in the Census Employee Handbook, Title 13 demands that we not release any data that might be considered personally identifiable information (PII) and furthermore gives guidelines on how to preserve our respondents' confidentiality.

29. Robert Snyder likewise demanded that I delete any remnants of the video or risk facing a criminal sanction of $250,000, the maximum allowable per Title 13.

30. My actions with respects to the making and publishing of the video did not break neither the written law of Title 13 nor any guidelines within the Census Bureau Employee Handbook. The law is specific as to its scope in that it only protects the confidentiality of private personal information collected by an enumerator in the performance of their duties.

31. Title 13 does not extend to a respondent's voluntary blurting of one's name and address in a context outside of our collecting data for the Census. Considering also that the respondent knew she was being filmed and did not even believe that I worked for the Census Bureau to begin with, she had no expectations of the privacy that Title 13 was designed to protect.

32. Robert Snyder furthermore admonished me for not leaving immediately following the racist encounter, despite my supervisor's direct request that I stay onsite.

33. Robert Snyder's only reaction to the video, aside from animosity towards my taking it, was a vague reference to perhaps taking my incident into consideration when the office prepares for the next Census in 2030.

34. Two days later, my wife, Katherine James, resigned from her position as office operations supervisor, despite my advising her to stay. Citing breach of trust and an egregious lack of racial sensitivity, she could no longer work directly for the Defendants that terminated her husband without due process, violated his First Amendment Rights, and demonstrated no semblance of fairness in punishing him for protecting himself against racially-motivated harassment.

35. The Defendant's actions directly and proximately violated my civil rights to free speech and due process.

36. The Defendants' actions directly and proximately caused our family to endure the financial ramifications of simultaneously losing our jobs, plus extreme emotional duress, embarrassment, sleepless nights, and acute PTSD.

**FIRST CAUSE OF ACTION**

**CIVIL RIGHTS VIOLATION — INFRINGEMENT UPON FREEDOM OF SPEECH**

**Ryon Rodgers Against All Defendants**

37. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

38. Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), where a federal employee "acting under color of [federal] authority" commits a constitutional tort, infringing upon someone's civil rights, it begets a cause of action for monetary damages directly under the United States Constitution.

39. In all allegations brought forth against the Defendants, they were acting in their official capacity as federal employees for the Bureau of the Census under the United States Department of Commerce.

40. In terminating my employment for recording and publishing a video depicting the racism I had encountered on assignment, Defendants retaliated against my exercise of Free Speech, which is guaranteed and protected by the First Amendment of the United States Constitution and Art. I, §2 of the California Constitution.

41. Defendants compounded their infringement of my right to free speech by demanding that I delete the video under threat of persecution under their vague and unsubstantiated interpretation of Title 13, despite the letter of the law indicating that I broke none of its rules or guidelines.

42. As a direct and proximate result of the Defendant's unlawful conduct, I suffered severe emotional distress, humiliation, mental and emotional anxiety. Furthermore given that their unlawful

conduct was the precipice behind their decision to terminate me, it likewise caused me substantial financial harm.

43. Cal. Civ. Code 52(b) allows me to seek statutory damages, both actual and punitive, the extent of which are not yet ascertained but within the jurisdiction of this court to determine and award.

## SECOND CAUSE OF ACTION

### CIVIL RIGHTS VIOLATION — VIOLATION OF DUE PROCESS

**Ryon Rodgers Against All Defendants**

44. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

45. In terminating my employment with the Bureau of the Census, Defendants deprived me of my right to Due Process under the 14th Amendment of the United States Constitution and Art. I, §7 of the California Constitution.

46. U.S. CONST. amend. XIV, § 1 states that employers may not deprive an employee of a property interest or interfere with an employee's liberty interest without providing that employee procedural due process.

47. Public employment can constitute a "property interest" subject to constitutional due process protections when statute, contract, or employer's conduct creates a reasonable and legitimate expectation of continued employment.

48. While enumerators are generally considered short-term employees, courts have found that even such positions, if renewed on a consistent basis, can create a reasonable expectation of continued

employment and property interest subject to due process protections. *Perry v. Sindermann*, 408 U.S. 593 (1972).

49. My consistently high reviews and accomplishment of all available performance bonuses earned me the promise of a transfer to the San Bernardino office once my duties for the Riverside branch were completed. Therefore absent any misconduct on my end, I had a reasonable expectation that I would be able to able to finish my current term and I had a propriety interest in the supplemental assignment.

50. Due process in the termination of civil employees dictates that at a minimum, the employer identifies the conduct giving rise to the dismissal, thereby giving the employee the opportunity of a response. *Linton v. Frederick County Bd. of Cty. Com'rs*, 964 F.2d 1436 (4th Cir. 1992) citing Supreme Court precedent, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532. (1985).

51. The decision to terminate me was done prior to my ability to even explain to the office manager what had happened. It was done before I even arrived at the office to fill out the incident report or submit the case notes. Neither Defendant gave me the opportunity to present my side of the story, nor even explain to me the nature of my alleged wrong-doing until I took it upon myself to repeatedly call their offices after already having been discharged.

52. As a direct and proximate result of the Defendant's unlawful conduct, I was unable to have even the opportunity to defend my actions at my job, thereby causing me the financial repercussions of losing it, in addition to the anxiety, emotional distress, and humiliation of having one's rights usurped without even the opportunity to defend them.

53. Cal. Civ. Code 52(b) allows me to seek statutory damages, both actual and punitive, the extent of which are not yet ascertained but within the jurisdiction of this court to determine and award.

## THIRD CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

**Ryon Rodgers Against All Defendants**

54. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

55. California wrongful termination law provides for relief in the event of a wrongful discharge in violation of public policy wherein an employer terminates an employee for exercising a right or privilege granted to them by statute or constitutional law.

56. The video can be demonstrated to satisfy multiple purposes, listed henceforth in the priority for which they were considered upon filming. All involve a matter of free speech, which either on its own volition or furtherance of statute or public policy, if deprived could be deemed by the court as a basis towards a finding of unlawful termination.

**The Video as a Vehicle of Self-Defense**

57. The law has long recognized the right of a person to protect themselves from injury, a right that does not end at the workplace and cannot be negated by any employer's policy or retaliation.

58. Per California Code, Labor Code - LAB § 6401, "every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees."

59. An employee that defends themselves from harm, not by force, but by peaceful documentation of a confrontation in attempts to de-escalate it, should satisfy a clear and substantial public policy of promoting safety and freedom from harassment in the workplace.

60. The recording of the respondent was primarily done to protect myself against potentially further insipid accusations of being a criminal.

61. The Census Employee Handbook offered no policy and enumerators receive no training as to how we are permitted to protect ourselves in such incidences, leaving us to our own common sense resolutions on how to protect ourselves from threats and harassment from respondents.

62. Having already been harassed to a level wherein it was impossible to do my job, my last option was to abandon my shift and escape the complex. Unfortunately the respondent was standing precariously close to my only visible means of leaving; the staircase separating her apartment and the one in front of which I was standing. Moving towards her might have exacerbated her inclination that I was a criminal. Given her paranoid frame of mind, she could have misinterpreted my movement as an attack, leaving me subject to a more perilous confrontation with her, her husband, and law enforcement once they arrived on the scene. My safest course of action was to ward her off by demonstrating that I was recording our incident so that any malicious allegation could be instantly disproven.

63. The Defendants threatened persecution and retaliated by termination the making and publishing of the video, penalizing the safest course of action any reasonable person would have taken to withdraw safely and prevent further harassment and assault.

**The Video as a Vehicle of First Amendment Speech on a Manner of Public Concern**

64. The courts have recognized that as a public employer, the government must balance its responsibilities of running an efficient workplace with their responsibility as a sovereign protecting the First Amendment rights of its citizens and workers.

65. Even while acting on the job, an employee's speech is protected, insofar as the court deems that the speech involves a matter of public concern and "its free expression outweighs the government's interest in promoting workplace efficiency or avoiding workplace disruption." *Waters v. Churchill*, 511 U.S. 661 (1994).

66. An ancillary benefit of the publishing of this incident was the attention it brought to the continued issue of racism in the workplace against black Americans.

67. With many people still believing that racism is not a modern problem, speech demonstrating first-hand accounts of discrimination as well as the waste of police resources to investigate "black activity" clears the bar of the common law test as being an important "political, social, or other concern to the community." *Brewster v. Board of Education of the Lynwood Unified School District*, 149 F.3d 971 (1998).

**The Video as a Vehicle of Disclosure of Employer's Working Conditions**

68. California Labor Code § 232.5 prohibits discharge, discipline, or discrimination against employees that disclose information about the employer's working conditions.

69. The video demonstrates the harassment and risk involved with being an enumerator when tasked with surveying what the Census Bureau Employee Handbook describes as a "dangerous address."

70. The video was not meant to be inflammatory in nature towards the respondent, the bureau, nor the enumerator position, but depicts the risks inherent in the workplace as factually and accurately as it can through first-hand account.

71. As a result of the Defendant's deprivation of my speech, henceforth violating the provisions or policies listed above, I have suffered loss of income, humiliation, mental and emotional pain and distress, damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Ryon Rodgers Against All Defendants**

72. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

73. A cause of action for intentional infliction of emotional distress (IIED) exists when the Defendant engages in 'outrageous conduct, knowingly causing, or recklessly disregarding the probability of causing severe or extreme emotional distress upon the plaintiff.' (Hughes v. Pair (2009) 46 Cal.4th 1035, 1050–1051 [95 Cal.Rptr.3d 636, 209 P.3d 963]).

74. The Defendants conducted absolutely no investigation into the racist incident of August 31st, made their decision to terminate me before giving me the opportunity to submit my incident report or tell my side of the story, made no recognition of the racist harassment and indignity I had suffered, and subverted my rights to free speech.

75. Robert Snyder furthermore threatened that if I do not delete the video of my harassment that I would be subject to a $250,000 penalty, misrepresenting (either mistakenly or intentionally) the scope of Title 13, insinuating criminal action on my part and embarrassing me in front of my wife and colleagues at the bureau.

76. Defendants had to have known that their callous behavior, disrespect, and buttressing of the racist behavior demonstrated towards me, would cause further and even greater stress and humiliation than even the incident itself. It is one thing to be harassed by a random racist stranger; it is far more damaging to have such bigotry supported by one's workplace, especially when the employment is furnished by the government whose role is supposed to be to unequivocally disavow racism and discrimination against their workers and community.

77. Defendants' constructive termination of my wife furthermore exacerbated my emotional distress and anxiety. Defendants effectively and knowingly presented my wife the option of resignation or allegiance to employers who terminated her husband for defending himself against racist attacks. My anxiety and subsequent guilt stems from the inevitability made obvious by the respondent and affirmed by the Defendants: that black Americans must continue to endure unwarranted hardships on account of their race, dragging along whatever family or friends that choose to show them love and solidarity.

78. As a direct and proximate result of the Defendants' actions, I have suffered and continue to suffer from PTSD, mental anguish, guilt, depression, anxiety, and severe emotional distress, the extent of the damage not yet fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

\\\

\\

## FIFTH CAUSE OF ACTION

### WRONGFUL TERMINATION

### Katherine James Against All Defendants

79. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

80. Constructive discharge occurs when the employer's conduct effectively forces an employee to resign because of conditions of employment or the workplace being "so intolerable or aggravated at the time....that a reasonable person in the employee's position would have resigned," if it can be demonstrated that the employer had constructive knowledge of the nature and impact of the aggravated conditions and could have taken reasonable steps to remedy the situation. *Zilmer v. Carnation Co.*, 215 Cal.App.3d 29 (1989).

81. Constructive discharge becomes illegal if the conditions behind it violate the same public policy that protect against direct unlawful termination.

82. In cases wherein management has been found to be reckless towards the civil rights of its staff, it has historically given rise to findings of constructive wrongful termination of all of the workers impacted; even if the wrongful conduct of the employer wasn't intended to cause direct harm to any one individual or to get any of them to quit.

83. When Defendants unlawfully terminated me for exercising First Amendment rights in speaking out against racism experienced at the job, no objective reasonable person would have expected my wife, Katherine James, to remain at her position, given that she was effectively faced with the option of choosing between her employer or her family/core belief system of fairness and equality.

84. Defendants had every opportunity to take reasonable steps to remedy the intolerable working conditions had they at least given me the due process guaranteed under the United States and California Constitutions, thereby demonstrating that they foster a workplace of respecting civil rights instead of deliberately trampling upon them.

85. As a direct and proximate result of Defendants' conduct, Katherine James has suffered loss of income, embarrassment, humiliation, mental and emotional pain and distress; damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

## SIXTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Katherine James Against All Defendants**

86. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

87. A cause of action for intentional infliction of emotional distress exists when the Defendant engages in abominable conduct, knowingly causing, or recklessly disregarding the probability of causing severe or extreme emotional distress upon the plaintiff.

88. Even though Defendants' actions were not directed at Katherine Rodgers, courts have deemed that actions taken against a third-party relation — in this case, her husband — can satisfy the elements of IIED.

89. Defendants forced upon Katherine James the unconscionable decision of leaving her job and upcoming promotion or remaining under the management of the people that fired her husband in

retaliation for defending himself against a racist attacks in the workplace. This "choice" is of such a distressful nature that "no reasonable person in a civilized society" should be expected to make or endure its ramifications. *Fletcher v. Western Life Insurance Co.*, (1970) 10 Cal.App.3d.

90. As a direct and proximate result of the Defendants' actions, Katherine James suffered and continues to suffer from mental anguish, humiliation, depression, sleepless nights and severe emotional distress.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1. For two months' worth of lost income and wages for my wrongful termination, encompassing the months of September and October, 2020, during which the census was estimated to be completed.
2. For six months' worth of lost income and wages to Katherine James, who having been promoted on August 25th, 2020, had the prospective of a stable career for the Department of Commerce.
3. For damages related to pain and suffering.
4. Statutory civil penalty in the sum of $25,000 pursuant to Cal. Civ. Code § 52.
5. Punitive damages, which are appropriate in public policy wrongful termination cases, if per discovery, the employer is furthermore found to be guilty of oppression, fraud, or malice.
6. Any further relief that the Court deems just.

The exact nature and extent of Plaintiffs' damages have not yet been calculated and Plaintiffs will seek leave of Court to amend this complaint to conform to proof at the time of trial.

**JURY DEMAND**

Plaintiffs demands a jury trial for all claims so triable.

Respectfully Submitted,

DATED: OCTOBER 9, 2020

RYON RODGERS

KATHERINE JAMES